PENROD, APPELLEE, v. OHIO DEPARTMENT OF
ADMINISTRATIVE SERVICES, APPELLANT.

[Cite as *Penrod v. Ohio Dept. of Adm. Servs.*,
113 Ohio St.3d 239, 2007-Ohio-1688.]

(No. 2005–2373 and 2005–2374—Submitted November
14, 2006—Decided April 25, 2007.)

O'CONNOR, J.

{¶ 1} In this appeal we consider whether the abolishment of a state employee's position was accomplished consistent with the requirements of former R.C. 124.321(D). We hold that it was not, and, thus, we affirm the judgment of the court of appeals.

**Facts and Procedural History**

{¶ 2} In 2002, defendant-appellant, the Ohio Department of Administrative Services ("DAS") decided to abolish the position of plaintiff-appellee, Joyce Penrod, who was a Facilities Planning Project Manager in the State Architect's Office ("SAO"). In that exempt position, Penrod supervised four employees and

assisted state agencies in office-space planning, including selection of furniture and equipment. Most employees of the SAO were paid out of rotary-fund accounts (which are monies paid by state agencies for work that the SAO has performed for them), but Penrod's salary was paid out of the state's General Revenue Fund ("GRF").

{¶ 3} In 2002, DAS's allocation from the GRF was cut by $1.4 million, or about 15 percent, for fiscal year 2003. In a letter dated August 5, 2002, Scott Johnson, the Director of DAS, notified Charles Wheeler, the deputy director of the DAS Human Resources Division, that DAS was "requesting authorization to conduct job abolishments with an effective date on or about September 4, 2002." The letter stated, "DAS is planning to reorganize offices within GSD [General Services Division] to improve the efficient operation of the department. Offices to be reorganized include the State Architect's Office, Office of Procurement Services, and State Printing. These offices have had to look at ways to be more efficient, therefore resulting in job abolishments."

{¶ 4} Attached to the letter were rationales for the abolishments. The rationale regarding Penrod's position provided:

{¶ 5} "With recent reductions in the state budget, and with additional budget reductions planned for the next bi-ennium, the SAO must now address reorganizing our Interior Design Services (IDS) to efficiently accommodate available capital projects and capital funds.

{¶ 6} "As a matter of history and justification, SAO completely reorganized its office structure to focus on individual clients as a whole as opposed to geographic location in January 2001. With the success of SAO's reorganization, the decision has now been made to mirror the client based project management within the IDS. Further, the IDS facility planners will be assigned to the existing project management teams within SAO for a full faceted service for our customers.

{¶ 7} "With this reorganization, the need for a separate, individual supervisor is no longer needed. The facility planners will then report to a designated Deputy State Architect who in turn reports to the State Architect. The supervisory duties will be assigned to each Deputy State Architect and remaining duties will be spread out to the four (4) Facility Planners. The Facility Planners will continue to coordinate with building [managers], review design processes and use CADD to design office space for State agencies.

{¶ 8} "As with any reorganization we must utilize our resources to their fullest potential. It is SAO's experience that the 'team' approach to project management is not only necessary but much more efficient than dividing our resources. By eliminating the separation of services between SAO and IDS, we will be able to provide our customers more efficient and thorough service. Thus, the position of Facility Planning Program Manager, PCN 11100.0 will be abolished."

{¶ 9} DAS's reorganization of the SAO resulted in the abolishment of 17 positions, including Penrod's. A significant factor underlying the decision to abolish her particular position was that funding for that position came from the GRF. The reorganization left the division with roughly 60 percent of its previous staff positions to cover the projects for which that office was responsible. Five new employees were hired approximately 11 months after the August 2002 job abolishments, including three project managers who were all architects, and two energy specialists, but the added positions were funded out of rotary accounts rather than the GRF.

{¶ 10} Penrod appealed the abolishment of her position to the State Personnel Board of Review ("SPBR"). An Administrative Law Judge ("ALJ") conducted an evidentiary hearing, at which DAS attempted to show that it had abolished Penrod's position to increase efficiency. After the hearing, the ALJ recommended that the abolishment be disaffirmed, stating that "the testimony and documentation presented indicate that the true underlying reason for the abolishment of * * * Penrod's position was that of the budget, or in other words, for economical reasons."

{¶ 11} The SPBR rejected the ALJ's recommendation and affirmed the abolition of Penrod's position. The SPBR disagreed with the ALJ's determination that DAS had given one reason for the abolishment (efficiency) but the evidence supported a different reason (economy). The SPBR held that an appointing authority may select more than one R.C. 124.321 rationale to support its decision to abolish a position, and that in this case, the appointing authority did so.

{¶ 12} Penrod appealed the SPBR's decision to the Franklin County Court of Common Pleas under R.C. 119.12. That court reversed the SPBR's decision, concluding that it was not supported by the evidence and that DAS had failed to prove that increased efficiency resulted from the job abolishment. The trial court phrased the central issue as "whether failure to identify economy as the basis for the abolishment instead of reorganization for efficiency requires disaffirmance." Near the end of its decision, the trial court stated, "There may be more than one basis for a job abolishment, nonetheless the appointing authority should be held to a standard of enunciating the actual basis or bases in order to fairly apprise an employee of her or his rights if a dispute should arise and an appeal prompted."

{¶ 13} The Tenth District Court of Appeals affirmed the judgment of the trial court, 2005-Ohio-5836, and then certified a conflict on the following issue: "When an appointing authority abolishes an employee's position as a result of a reorganization for efficient operation under former R.C. 124.321(D), may the appointing authority satisfy former R.C. 124.321(D) by showing that it reasonably projected that greater efficiency would result, or must an appointing authority also show

that the abolishment actually resulted in improved efficiency?" 2005-Ohio-6611. The conflict case is the decision of the First Appellate District in *McAlpin v. Shirey* (1997), 121 Ohio App.3d 68, 698 N.E.2d 1051.

{¶ 14} This court accepted jurisdiction over DAS's discretionary appeal (case No. 2005–2373), determined that a conflict exists (case No. 2005–2374), and consolidated the two cases for consideration. 108 Ohio St.3d 1473, 2006-Ohio-665, 842 N.E.2d 1053.

## Former R.C. 124.321(D)

{¶ 15} At the time the events in this case occurred, former R.C. 124.321[1] applied when an "appointing authority" reduced its work force by laying off employees or abolishing positions. See former R.C. 124.321(A). Sub.H.B. No. 231, 142 Ohio Laws, Part II, 2635, 2654. Former R.C. 124.321(B) applied to layoffs for "lack of funds." Id. Former R.C. 124.321(C) applied to layoffs for "lack of work." Id. at 2655. This case is specifically governed by former R.C. 124.321(D), which applied to "abolishments of positions." Id.

{¶ 16} Former R.C. 124.321(D) provided: "Abolishment means the permanent deletion of a position or positions * * * due to lack of continued need for the position. An appointing authority may abolish positions as a result of a reorganization for the efficient operation of the appointing authority, for reasons of economy, or for lack of work. * * * Appointing authorities shall themselves determine whether any position should be abolished and shall file a statement of rationale and supporting documentation with the director of administrative services prior to sending the notice of abolishment."[2] Sub.H.B. No. 231, 142 Ohio Laws, Part II, 2635, 2655. See, also, Ohio Adm.Code 123:1–41–04.

{¶ 17} In *Weston v. Ferguson* (1983), 8 Ohio St.3d 52, 54, 8 OBR 523, 457 N.E.2d 818, this court stated, "The critical guideline in the abolition of a civil service position is that it must be done in good faith and not as a subterfuge." Although *Weston* was decided before the enactment of statutory guidelines governing the abolishment of positions, the observation in *Weston* still rings true,

---

1. R.C. 124.321 was amended, effective September 29, 2005, by Am.Sub.H.B. No. 66, and then subsequently by 2006 Am.Sub.H.B. No. 530.

2. {¶ a} R.C. 124.321(D)(1) now provides, "For purposes of this division, an appointing authority may abolish positions for any one or any combination of the following reasons: as a result of a reorganization for the efficient operation of the appointing authority, for reasons of economy, or for lack of work."

{¶ b} R.C. 124.321(D)(2) now provides guidelines for abolishments for "reasons of economy."

{¶ c} R.C. 124.321(D)(3) now provides that an "appointing authority shall determine itself whether any position should be abolished and shall file a statement of rationale and supporting documentation with the director of administrative services prior to sending the notice of abolishment."

and it is reasonable to conclude that the statutes were enacted with that same underlying intent. Consistent with that view, it is important to remember that when an abolishment occurs, a *position* is eliminated, which is not the same thing as a specific *employee* being selected for termination. If an appointing authority uses a job abolishment as a pretense to target a specific employee for termination, the abolishment should not withstand scrutiny.

{¶ 18} In *State ex rel. Bispeck v. Trumbull Cty. Bd. of Commrs.* (1988), 37 Ohio St.3d 26, 29, 523 N.E.2d 502, this court stated that "although the [SPBR] may not substitute its judgment for that of the [appointing authority], the [SPBR] does have the power to determine from the evidence presented to it whether the [appointing authority's] abolishment of Bispeck's position was arbitrary, unreasonable, or unlawful and whether the abolishment was proper and necessary." See, also, *State ex rel. Ogan v. Teater* (1978), 54 Ohio St.2d 235, 245, 8 O.O.3d 217, 375 N.E.2d 1233, and at paragraph four of the syllabus. This court in *Bispeck* determined that the appointing authority bears the burden of proving the sufficiency of the substantive reasons for a position abolishment. Id. at 27–28, 523 N.E.2d 502.

## The Certified–Conflict Issue

{¶ 19} Although the references in the preceding paragraph to this court's *Bispeck* decision illustrate that some principles that emerge from that decision are fundamental, certain other concepts discussed within *Bispeck* have received varying treatment by courts of appeals. The issue certified as in conflict in this case springs from two different interpretations of some of the analysis in *Bispeck*.

{¶ 20} In *Bispeck*, a county employee's position was abolished pursuant to R.C. 124.321(D). The SPBR disaffirmed the abolishment, but the county refused to reinstate Bispeck. Bispeck then sought to force his reinstatement through a writ of mandamus. In concluding that Bispeck had a clear legal right to be reinstated to his previous position, this court noted that "[i]n order to determine whether any efficiency gains were accomplished by the abolishment, the [SPBR] must consider the county's operations before and after the abolition." *Bispeck*, 37 Ohio St.3d at 30, 523 N.E.2d 502. This court further noted that "the intent of the General Assembly was to require an appointing authority to justify a job abolishment by proving that the abolishment would result in more efficient operations." Id. at 30–31, 523 N.E.2d 502.

{¶ 21} In *McAlpin v. Shirey*, 121 Ohio App.3d 68, 698 N.E.2d 1051 (the opinion certified as conflicting with the court of appeals' opinion in this case), McAlpin's assistant police chief position was abolished and he was demoted to police captain. The city civil service commission and the court of common pleas both upheld the abolishment. In also affirming the abolishment, the First District Court of Appeals, based on its construal of *Bispeck*, held that "[t]o justify a job abolish-

ment as part of a reorganization, the city must prove that the abolishment was undertaken to promote efficiency, not that increased efficiency actually resulted from the abolishment." *McAlpin,* paragraph three of the syllabus.

{¶ 22} The First District in *McAlpin* agreed with the common pleas court that " 'to adopt appellant's position that a * * * City * * * must establish prior to the abolishment of a civil service position that the abolishment *will result* in greater efficiency is to * * * delegate a position of the managerial and fiscal responsibility of the City government to the Civil Service Commission. Such a delegation of legislature [*sic*] and executive authority is inappropriate. Rather, the rule should be * * * that the Commission may approve the abolishment if it finds it is designed to promote efficiency in the future and is not an attempt to avoid civil service laws.' (Emphasis *sic*.)" *McAlpin,* 121 Ohio App.3d at 75–76, 698 N.E.2d 1051.

{¶ 23} The Tenth District Court of Appeals in this case specifically disagreed with the reasoning underlying *McAlpin:*

{¶ 24} "We believe the court's view in [*McAlpin*] that a reviewing authority, such as the SPBR, properly may approve an abolishment if it finds that such an abolishment is designed to promote efficiency in the future and is not an attempt to avoid civil service laws is inconsistent with *Bispeck.* To merely require that a reviewing authority show that an abolishment was undertaken for purposes of efficiency without demonstrating efficiency gains conflicts with *Bispeck*'s instruction that ' * * * the [SPBR] must consider the county's operation before and after the abolition.' *Bispeck,* [37 Ohio St.3d] at 30, 523 N.E.2d 502." *Penrod v. Ohio Dept. of Adm. Servs.,* 10th Dist. No. 04AP–1118, 2005-Ohio-5836, 2005 WL 2882924, ¶ 25.

{¶ 25} Although this court determined that a conflict exists between the decision below in this case and *McAlpin,* after further review of the record we now determine that there is no need to resort to the conflict issue to resolve this appeal.

{¶ 26} As an initial matter, there are several significant factors that distinguish *Bispeck* from the present case. Those factors signal that we should be cautious not to pluck a few statements from *Bispeck* and apply them overly literally, without remembering their context. For one thing, in *Bispeck,* the appointing authority expressly stipulated that the position abolishment was not based on a lack of funds, so there was no issue as to whether there were economic motivations for the abolishment. 37 Ohio St.3d at 26, 523 N.E.2d 502.

{¶ 27} Furthermore, unlike in the present case, the circumstances surrounding the abolishment of Bispeck's position suggested bad faith by the appointing authority, which ultimately led the SPBR to reconsider its earlier decision affirming the abolishment and to conclude that the appointing authority had

"failed to prove the abolishment of Bispeck's position would result in more efficient operations." Id. at 26–27, 523 N.E.2d 502.

{¶ 28} Based on these unique features of *Bispeck*, it seems questionable whether the principles that emerge from that decision that are directly implicated in the certified-conflict issue should have broad application in different circumstances. However, our determination that this case should be resolved on grounds that do not implicate the certified-conflict issue means that resolution of that issue will have to await another day.

### R.C. 124.321's "statement of rationale and supporting documentation"

{¶ 29} Our consideration of the entire record convinces us that the focus of this case should be on the adequacy of the rationale and supporting documentation put forth by appellant DAS for abolishing Penrod's position. The reasons underlying the General Assembly's purpose within both former and current R.C. 124.321(D) in requiring an appointing authority to provide a rationale and documentation for a job abolishment include " '(1) to assure that the appointing authority analyzes the basis for abolishing a position, at least to the extent of being enabled to articulate that basis; (2) to place the appointing authority on record in that regard; and (3) to assist an affected employee in determining if there be any basis for an appeal.' " *Fragassi v. Lorain Cty. Bd. of Commrs.* (Mar. 14, 1995), 10th Dist. Nos. 94APE07–950, 94APE07–951, 94APE07–952, and 94APE07–953, 1995 WL 115498, quoting *In re Appeal of Rawat* (May 15, 1984), 10th Dist No. 83AP–980, 1984 WL 5748. It is apparent that the relevant statutes, administrative code provisions, and caselaw, including decisions of this court, together establish that an employee whose position is abolished deserves a straightforward explanation for the abolishment. This principle is especially supported by the overriding purposes underlying R.C. 124.321, which are to ensure that employees are not subject to arbitrary treatment and that any position abolishment must be made in good faith. See *Weston*, 8 Ohio St.3d at 54, 8 OBR 523, 457 N.E.2d 818.

{¶ 30} As will be explained below, the statement of rationale for the abolishment of Penrod's position offered by DAS was fundamentally deficient as a matter of law, and this case is resolvable on that ground alone. Although the abolishment in this case may have been made necessary by budget cuts (and thus based on economy factors), the rationale offered focused almost exclusively on the supposed efficiency that was going to result from the abolishment, and failed to apprise Penrod of the true reasons why her position was abolished.

{¶ 31} DAS's statement of rationale regarding the abolishment of Penrod's position starts out with a reference to budget cuts by stating, "With recent reductions in the state budget, and with additional budget reductions planned for the next bi-ennium, the SAO must now address reorganizing our Interior Design

Services (IDS) to efficiently accommodate available capital projects and capital funds." However, there is no follow up on that lead—the rest of the rationale discusses only efficiency and does not mention budget cuts or anything even remotely concerning any "economy" factors again. This fleeting reference to the budget does not qualify as an actual "rationale" justifying the abolishment, so no true economy-based rationale was put forth by DAS.

{¶ 32} In recommending that the abolishment should be disaffirmed, the ALJ's report and recommendation summarized the evidence presented regarding the abolishment, including the testimony of the witnesses, and then concluded:

{¶ 33} "While [DAS] certainly could have determined that it was necessary to reorganize * * * to increase efficiency, [DAS] did not do that. Instead, because [DAS was] facing budget cuts, [DAS] needed to abolish positions and then, because of the abolishments, [DAS] had to realign duties. * * * [T]he real and underlying reason for the abolishment of * * * Penrod's position was the budget, not efficiency."

{¶ 34} The ALJ did cite *Bispeck* in support of her conclusion, to the effect that DAS bore the burden of proving improved efficiency and that it was necessary to examine the operations of the appointing authority both before and after the abolishment to determine if efficiency resulted. However, the ALJ's recommendation was based on her view that no evidence was presented regarding the efficiency of the office before the abolishment and that DAS's evidence going to efficiency following the abolishment clearly showed that the office was less efficient after the abolishment, due to the budget cutbacks and lack of funding. Thus, the ALJ in essence found that the evidence and testimony presented supported the conclusion that the abolishment was solely for reasons of economy, that *no evidence* supported the efficiency justification put forth by DAS in its statement of the rationale for the abolishment, and that *Bispeck* was not satisfied for that reason.

{¶ 35} In rejecting the recommendation of the ALJ, the SPBR characterized the ALJ's recommendation as being based on the ALJ's implicit beliefs that an appointing authority must select one, and only one, of R.C. 124.321's rationales to substantiate an abolishment decision and that the R.C. 124.321 rationales do not overlap. Then, the SPBR proceeded to disagree with the ALJ's alleged implicit beliefs by explaining the overlap of the meanings of the words "efficiency" and "economy" and consequently held that the abolishment should stand and that DAS had met its burden of proof.

{¶ 36} However, the record does not support the SPBR's interpretation of the ALJ's analysis. The ALJ concluded that in this particular case, DAS, for whatever reason, chose to rely solely on an efficiency rationale to justify its action within its statement of rationale. The evidence presented at the hearing,

however, particularly the testimony of the witnesses, conclusively indicated that economy, not efficiency, was the overriding basis for the abolishment.

{¶ 37} The ALJ rightly found that by not justifying the abolishment as being for reasons of economy in its statement of rationale at the time the abolishment occurred, DAS was foreclosed from asserting an after-the-fact economy rationale (or a rationale based on both efficiency and economy) after Penrod challenged the abolishment. The trial court and the court of appeals also took the view that the abolishment could not stand as a matter of law, with the trial court applying the proper standard of review to conclude that the SPBR's decision was not supported by reliable, probative, and substantial evidence, and the court of appeals affirming that conclusion.

{¶ 38} The ALJ therefore did not even truly reach the standards implicated by the certified-conflict issue, and this court need not go that far in deciding this case either. DAS, in choosing to rely solely on a flawed efficiency rationale, has not met its burden of proof, without regard to what the contested language from *Bispeck* may say. We agree with the trial court that the SPBR's order upholding the abolishment was not supported by the evidence. Our agreement, however, is not based on any consideration of *Bispeck*'s statement concerning comparison of the evidence before and after the abolishment; rather, it is based on the consideration that insufficient evidence was presented at the hearing to support the "efficiency" rationale relied on by DAS as an initial matter.

{¶ 39} In short, by making no attempt to state the true reason for the abolishment in its statement of rationale, DAS put forth a misleading basis as to why it did what it did. In light of the principles governing an abolishment discussed earlier in this opinion, it is not unfair or overly burdensome to hold the appointing authority to a standard of articulating the actual reason or reasons for the abolishment in its statement of rationale.

{¶ 40} In considering whether the appointing authority has complied with the requirement that it must state its rationale for the abolishment in an honest and forthright way, a strict-compliance standard is most appropriate, in light of the important interests that are at stake. An employee who faces the abolishment of his or her position has a right to expect fair treatment from the appointing authority. The appointing authority has a corresponding duty of candor to the employee.

{¶ 41} In *State ex rel. Potten v. Kuth* (1980), 61 Ohio St.2d 321, 15 O.O.3d 391, 401 N.E.2d 929, paragraph three of the syllabus, this court held, "In order for a layoff of an employee in the classified state service to be effective, the appointing authority must substantially comply with the procedural requirements promulgated by the Director of [DAS] pursuant to R.C. 124.32." See, also, Ohio Adm.Code 124–7–01(A)(3) ("Layoffs and abolishments may only be affirmed if the appointing

authority has substantially complied with procedural requirements set forth in section 124.321 of the Revised Code, et seq., and the administrative rules promulgated pursuant to these statutes"). In this case, the parties stipulated that the procedural requirements had been met. But the issue concerning DAS's compliance with former R.C. 124.321's requirements of a "statement of rationale and supporting documentation" is substantive and so is not subject to a substantial-compliance interpretation. Furthermore, DAS bore the burden of proving the sufficiency of the substantive reasons it asserted for the position abolishment. *Bispeck*, 37 Ohio St.3d at 27–28, 523 N.E.2d 502.

## Conclusion

{¶ 42} The record fully supports that Penrod was a valuable and productive employee. Although even a marginal employee deserves equitable treatment from an appointing authority, a conscientious employee should particularly be entitled to expect forthrightness and candor.

{¶ 43} In this case, there were multiple reasons for the abolishment of Penrod's position. The record reveals no indications that Penrod was personally targeted for termination; rather it appears that her position was eliminated in the reorganization process. The abolishment likely could have been justified by a rationale that explained the actual reasons; however, by choosing to articulate only the misleading rationale of efficiency for this particular abolishment, DAS was not forthright with Penrod. Furthermore, DAS did not meet its burden of establishing that efficiency was the reason for the abolishment. In a situation such as this, DAS's lack of compliance need not rise to the level of bad faith for the abolishment to be overturned; it is sufficient that DAS failed to comply with the statutory requirements. We affirm the judgment of the court of appeals.

Judgment affirmed.

Shaw, Pfeifer and Lanzinger, JJ., concur.

Moyer, C.J., Lundberg Stratton and O'Donnell, JJ., dissent.

Stephen R. Shaw, J., of the Third Appellate District, was assigned to sit for Resnick, J., whose term ended on January 1, 2007.

Cupp, J., whose term began on January 2, 2007, did not participate in the consideration or decision of this case.

---

Lundberg Stratton, J., dissenting.

{¶ 44} I respectfully dissent. The Tenth Appellate District has certified the following question to this court after determining that its decision conflicts with a decision from the First District: "When an appointing authority abolishes an

employee's position as a result of a reorganization for efficient operation under former R.C. 124.321(D), may the appointing authority satisfy former R.C. 124.321(D) by showing that it reasonably projected that greater efficiency would result, or must an appointing authority also show that the abolishment actually resulted in improved efficiency?"

{¶ 45} Today the majority ignores a conflict that I believe is squarely presented and was the basis for the decisions of the lower courts in this case. Instead, the majority simply finds that the "statement of rationale * * * was fundamentally deficient," which is to say the court disagrees with the factual basis for the actions of the Ohio Department of Administrative Services ("DAS"). The majority resolves this case on an analysis of the facts, not the law. I respectfully disagree with its factual analysis and its avoidance of the legal issues.

{¶ 46} I would hold that when an appointing authority abolishes a position as a result of a reorganization for the efficient operation of the appointing authority under former R.C. 124.321(D), the appointing authority may satisfy former R.C. 124.321(D) by showing that it reasonably projected that greater efficiency would result, regardless of whether efficiency gains are later realized. A reorganization for "efficient operation" under former R.C. 124.321(D) does not require a public employer to precisely maintain previous levels of service, whether measured by quantity or quality, but rather requires only that the employer reasonably project that the cost savings will outweigh any decrease in productivity. Therefore, I would reverse the judgment of the court of appeals and reinstate the decision of the State Personnel Board of Review.

### Efficient Operation and Reasonable Projections

{¶ 47} R.C. 124.321(D) governs the abolishment of positions by an appointing authority.[3] R.C. 124.321 has since been revised, but at the time that Penrod's position was abolished, R.C. 124.321(D) provided:

{¶ 48} "Employees may be laid off as a result of abolishment of positions. Abolishment means the permanent deletion of a position or positions from the organization or structure of an appointing authority due to lack of continued need for the position. An appointing authority may abolish positions as a result of a reorganization for the *efficient operation* of the appointing authority, for *reasons of economy*, or for *lack of work*. The determination of the need to abolish positions shall indicate the lack of continued need for positions within an appointing authority. Appointing authorities shall themselves determine whether any position should be abolished and shall file a statement of rationale and

---

3. " 'Appointing authority' means the officer, commission, board, or body having the power of appointment to, or removal from, positions in any office, department, commission, board, or institution." R.C. 124.01(D).

supporting documentation with the director of administrative services prior to sending the notice of abolishment." (Emphasis added.) Sub.H.B. No. 231, 142 Ohio Laws, Part II, 2635, 2655.

{¶ 49} The reason given by DAS for the abolishment of Penrod's position was reorganization for the efficient operation of the office.

{¶ 50} In affirming the judgment of the trial court and concluding that a job abolishment must result in actual improved efficiency, the Tenth District relied on this court's decision in *State ex rel. Bispeck v. Trumbull Cty. Bd. of Commrs.* (1988), 37 Ohio St.3d 26, 523 N.E.2d 502. In *Bispeck,* this court considered a case in which a county employee's position was abolished pursuant to R.C. 124.321(D). The State Personnel Board of Review disaffirmed the abolishment, but the county refused to reinstate Bispeck. Bispeck then filed a writ of mandamus. In concluding that Bispeck had a clear legal right to be reinstated to his previous position, this court noted that "[i]n order to determine whether any efficiency gains were accomplished by the abolishment, the board must consider the county's operations before and after the abolition." *Bispeck* at 30, 523 N.E.2d 502.

{¶ 51} Penrod points to that sentence in *Bispeck* to support her argument that this court requires a comparison between the office's efficiency before the abolishment with its efficiency after the abolishment. In my view, *Bispeck* should not be read to require that improved efficiency actually resulted from the abolishment. Rather, under *Bispeck,* actual increased efficiency should be but one factor to examine in determining the reasonableness of the employer's decision to abolish a position.

{¶ 52} The language in *Bispeck* was an articulation of one method to be used to determine whether efficiency was the true reason for the abolishment. *Bispeck* points out that the board may compare the organization before and after the abolishment to determine whether the decision, at the time it was made, was based on a reasonable projection.

{¶ 53} Notably, this court also stated in *Bispeck,* "We believe that the intent of the General Assembly was to require an appointing authority to justify a job abolishment by proving that the abolishment *would result* in more efficient operations." (Emphasis added.) 37 Ohio St.3d at 30–31, 523 N.E.2d 502. This reading of the statute does not create a situation where mere recitation of the statutory grounds for abolishment would suffice. Under this standard, the employer must still show that its projection of increased efficiency was reasonable.

{¶ 54} Further evidence of the General Assembly's intent to allow the board to examine the reasonableness of the appointing authority's projection of increased efficiency, rather than requiring actual improved efficiency, is found in Ohio

Adm.Code 124–7–01(A)(1), which states that "[t]he appointing authority shall demonstrate by a preponderance of the evidence that a job abolishment *was undertaken* due to a lack of continuing need for the position based on: a reorganization for the efficient operation of the appointing authority; reasons of economy; or a lack of work expected to last one year or longer." (Emphasis added.) And pursuant to Ohio Adm.Code 123:1–41–04, "[t]he statement of rationale and supporting information [for abolishing a position] shall contain information as is available *prior to the time* the layoff notices are mailed or delivered to the employees to be laid off as a result of the abolishments." (Emphasis added.)

{¶ 55} In the conflict case, *McAlpin v. Shirey*, 121 Ohio App.3d 68, 698 N.E.2d 1051, a police officer filed an action challenging a court of common pleas decision affirming a city civil service commission's upholding the abolishment of an assistant police chief position and McAlpin's resulting demotion to police captain. The First District, relying on *Bispeck*, held that "[t]o justify a job abolishment as part of a reorganization, the city must prove that the abolishment was undertaken to promote efficiency, not that increased efficiency actually resulted from the abolishment." Id., paragraph three of the syllabus.

{¶ 56} The *McAlpin* court agreed with the common pleas court that " 'to adopt appellant's position that a * * * City * * * must establish prior to the abolishment of a civil service position that the abolishment *will result* in greater efficiency is to * * * delegate a position of the managerial and fiscal responsibility of the City government to the Civil Service Commission. Such a delegation of legislature [*sic*] and executive authority is inappropriate. Rather, the rule should be * * * that the Commission may approve the abolishment if it finds it is designed to promote efficiency in the future and is not an attempt to avoid civil service laws.' (Emphasis *sic*.)" *McAlpin*, 121 Ohio App.3d at 75–76, 698 N.E.2d 1051. I agree with the reasoning of *McAlpin*.

{¶ 57} The focus is whether the decision to abolish the position was "arbitrary, unreasonable, or unlawful and whether the abolishment was proper and necessary," *Bispeck*, 37 Ohio St.3d at 29, 523 N.E.2d 502, not whether the projected improved efficiency came to fruition. A plain reading of former R.C. 124.321(D) leads to this conclusion.

{¶ 58} Accordingly, I would hold that when an appointing authority abolishes a position as a result of a reorganization for the efficient operation of the appointing authority under former R.C. 124.321(D), the appointing authority may satisfy former R.C. 124.321(D) by showing that it reasonably projected that greater efficiency would result, regardless of whether efficiency gains are later realized.

Efficient Operation and Level of Service

{¶ 59} If a public employer may, pursuant to former R.C. 124.321(D), abolish a position for "efficient operation" by reasonably projecting that greater efficiency would result from eliminating the position, regardless of whether greater efficiency is later realized, the next question I believe the court should answer is: What does efficient operation mean?

{¶ 60} "Efficient" is not defined in R.C. Chapter 124. Pursuant to R.C. 1.42, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." "Efficient" means "marked by ability to choose and use the most effective and least wasteful means of doing a task or accomplishing a purpose" and "marked by qualities, characteristics, or equipment that facilitate the serving of a purpose or the performance of a task in the best possible manner." Webster's Third New International Dictionary (1986) 725.

{¶ 61} The State Architect's Office argues that it has reduced its costs by 50 percent, but still provides 95 percent of the services it did before it reduced costs. By abolishing Penrod's position, the State Architect's Office eliminated a supervisory position, and the duties of the position were absorbed by other employees. State Architect Roger Booker testified before the board, "We've been able to maintain our * * * project load and * * * had little or no complaints of any significance from our * * * clientele." In fact, Booker testified that after the positions were abolished, his office handled "pretty much * * * the same number of projects [as it had before the abolishments] with * * * half as many people * * * roughly." To reinstate Penrod to a position that has been abolished injects *inefficiency* into a reorganization that has proven successful.

{¶ 62} The appellate court below held, in effect, that increased efficiency had not occurred, because the office had anticipated that the overall level of service would be reduced following the abolishments, and after the abolishment, the office was no longer providing its services at the same level of intensity as before. *Penrod v. Ohio Dept. of Adm. Servs.*, 10th Dist. No. 04AP–1118, 2005-Ohio-5836, 2005 WL 2882924, ¶ 37. According to this analysis, if an employer's output is reduced at all, then an abolishment based on efficiency is invalidated, regardless of how much the employer's costs were reduced. I disagree.

{¶ 63} A public employer may increase efficiency by increasing services without increasing costs or by reducing costs without reducing services. But "reorganization for the efficient operation" of an office may also include a reorganization that results in a small reduction in the quantity or quality of services at a greater reduction in cost. If the government is not permitted to engage in such a cost-benefit analysis, then greater efficiency will seldom be realized and the size of government will rarely be reduced.

{¶ 64} Penrod argues that *Bispeck* holds that an office's not having to pay the salary of the abolished position, alone, is not sufficient to prove increased efficiency. *Bispeck*, 37 Ohio St.3d at 31, 523 N.E.2d 502. Increased efficiency does not result if the decrease in salaries corresponds to an equal decrease in production. However, *Bispeck* did not address the situation in which the employer's cost was significantly decreased while productivity remained relatively the same. To give "efficient" its plain meaning, a more efficient operation results when the employer provides services at or near the same level while reducing costs. Therefore, I would find that the board was correct in finding that the abolishment was made as a result of a reorganization for the efficient operation of the office.

{¶ 65} Accordingly, I would hold that a reorganization for "efficient operation" under former R.C. 124.321(D) does not require a public employer to precisely maintain previous levels of service, whether measured by quantity or quality, but rather requires only that the employer reasonably project that the cost savings will outweigh any decrease in productivity. In my view, the testimony in this case clearly shows that the reorganization cut costs far more than it reduced services, demonstrating that DAS satisfied the *Bispeck* test for showing that it had reasonably projected that the abolishment would increase efficiency.

{¶ 66} The record is replete with references to Penrod's capability as facilities planning project manager. By all accounts, Penrod was a good employee, but her job performance is not at issue here. Public employers need flexibility to streamline operations to more efficiently utilize taxpayer dollars, and this is exactly what the statute allows. For the above reasons, I would reverse the judgment of the court of appeals and reinstate the decision of the State Personnel Board of Review. I respectfully dissent.

MOYER, C.J., and O'DONNELL, J., concur in the foregoing opinion.

———————

David L. Strait, for appellee.

Marc Dann, Attorney General, Stephen P. Carney, State Solicitor, and Jack W. Decker and Nicole S. Moss, Assistant Attorneys General, for appellant.